UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NYLSSA KRYSTHELLA PORTILLO-MORENO**,**<br>Laredo Detention Center<br>4702 E Saunders St.<br>Laredo, TX 78041;<br><br>**Plaintiff**,<br><br>v.<br><br>**CHAD WOLF**, *in his purported official capacity as Acting Secretary of the Department of Homeland Security*,<br>2707 Martin Luther King, Jr. Avenue, SE<br>Washington, DC 20528;<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS")**,<br>Office of the General Counsel<br>U.S. Department of Homeland Security<br>2707 Martin Luther King Jr. Ave, SE<br>Washington, DC 20528-0485<br><br>**DONALD J. TRUMP,** *in his official capacity as The President of the United States of America,*<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500<br><br>**WILLIAM P. BARR,** *in his official capacity as Attorney General of the United States of America*,<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530;<br><br>**KENNETH T. CUCCINELLI, II**, *in his purported official capacity as Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services*,<br>20 Massachusetts Avenue, NW<br>Washington, DC 20529; | Case No. 20-cv-2097<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**U.S. CITIZENSHIP AND IMMIGRATION SERVICES ("USCIS"),**
Office of General Counsel
20 Massachusetts Avenue, NW
Room 4210
Washington, DC 20529

**MATTHEW ALBENCE,** *in his purported official capacity as Acting Director of ICE,*
500 12th Street, SW
Washington, DC 20536;

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"),**
500 12th Street, SW
Washington, DC 20530;

**MARK MORGAN,** *in his official capacity as* **ACTING COMMISSIONER OF CBP,**
1300 Pennsylvania Avenue, NW
Washington, DC 20229;

**U.S. CUSTOMS AND BORDER PROTECTION ("CBP"),**
Office of Chief Counsel
U.S. Customs and Border Protection
1300 Pennsylvania Avenue, Suite 4.4-B
Washington, DC 20229

**Defendants**.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Nylssa Krysthella Portillo Moreno, by and through counsel, files this civil action against Defendants Chad Wolf, Acting Secretary of the Homeland Security; U.S. Department of Homeland Security ("DHS"); Donald J. Trump, The President of the United States of America; William P. Barr, Attorney General of the United States of America; Kenneth T. Cuccinelli, II, Acting Director of U.S. Citizenship and Immigration Services ("USCIS"); U.S. Citizenship and Immigration Services ("USCIS"); Matthew Albence, Acting Director U.S. Immigration and Customs Enforcement ("ICE"); U.S. Immigration and Customs Enforcement ("ICE"); Mark

2

Morgan, Acting Commissioner of U.S. Customs and Border Protection ("CBP"); U.S. Customs and Border Protection ("CBP") (collectively "Defendants") to vindicate her substantive and procedural due process rights under the Fifth Amendment of the U.S. Constitution, and the Administrative Procedures Act, 5 U.S.C. § 706(2)(A).

## **INTRODUCTION**

On June 18, 2020, the United States Supreme Court held that the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals ("DACA") policy violated the Administrative Procedure Act and that the rescission of DACA "must be vacated." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 18-587, 2020 WL 3271746, at *3 (U.S. June 18, 2020). Plaintiff, Ms. Nylssa Portillo Moreno, is a DACA-eligible individual whose application for DACA relief has not been addressed by the Department of Homeland Security. Urgently, she is scheduled for removal to El Salvador on August 4, 2020—this coming Tuesday—despite the Department's failure to process the application. Ms. Portillo Moreno has resided in the United States of America for 27 years, has not been to El Salvador in three decades, and knows no one in El Salvador.

The government's basis for withholding adjudication of her application—effectively, a denial—is a July 28, 2020 memorandum authored by Mr. Chad Wolf, who purports to act with the authority of the Secretary of the Department of Homeland Security. Mr. Wolf, however, is not vested with legal authority to act as the Secretary of the Department because his appointment and tenure offend the Appointments Clause of the Constitution and the Federal Vacancies Reform Act. Accordingly, his memorandum is not backed by the force of law, and the Supreme Court's decision in *Regents* and developing progeny—at this juncture—dictate that Ms. Portillo Moreno's application be considered. Because she is scheduled for removal on August 4, 2020, harm is imminent, and Ms. Portillo Moreno respectfully requests a temporary restraining order

3

holding that Mr. Wolf has acted unlawfully and that the Department of Homeland Security must comply with the Supreme Court's directives in *Regents*.

## JURISDICTION

The court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction).

## VENUE

Venue is proper pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States located in the District of Columbia, and a substantial part of the events or omissions giving rise to the claim occurred in this District, namely, the formulation, approval, and publication of the July 28, 2020, Memorandum announcing that all pending initial DACA applications would be rejected.

## PARTIES

1. Plaintiff Ms. Portillo Moreno is a DACA-eligible individual who faces imminent deportation by DHS despite her pending DACA application.

2. Defendant U.S. Department of Homeland Security ("DHS") has responsibility for enforcing the immigration laws of the United States and is a department of the executive branch of the Government which has been delegated with authority over Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS).

3. Defendant Donald J. Trump is sued in his official capacity as the President of the United States of America. At all times relevant to this Complaint, he has had responsibility for enforcing the laws of the United States.

4. Defendant William P. Barr is sued in his official capacity as the Attorney General of the United States. At all times relevant to this Complaint, he has had responsibility

for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, has overseen the Executive Office of Immigration Review, and is empowered to grant relief from removal.

5. Defendant U.S. Citizenship and Immigration Services ("USCIS") is the sub-agency of DHS that processes benefits requests and is responsible for receipting, processing, and adjudicating applications for DACA.

6. Defendant U.S. Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.

7. Defendant U.S. Customs and Border Protection ("CBP") is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens apprehended near the U.S. border.

8. Defendant Chad Wolf is sued in his purported official capacity as the Acting Secretary of the Department of Homeland Security. In this capacity, he directs each of the relevant component agencies within DHS: ICE, USCIS, and CBP. As a result, Defendant Wolf has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant relief from removal and other relief.

9. Defendant Matthew Albence is sued in his purported official capacity as the Deputy Director and Senior Official Performing the Duties of the Director of ICE.

10. Defendant Kenneth T. Cuccinelli, II, is sued in his purported official capacity as the Senior Official Performing the Duties of the Director of USCIS.

11. Defendant Mark Morgan is sued in his purported official capacity as the Senior Official Performing the Duties of the Commissioner of CBP.

**RELEVANT FACTS**

**The History of Legal Challenges to the Deferred Action for Childhood Arrivals Memorandum**

5

12. In 2012, the Department of Homeland Security (DHS) issued a memorandum announcing an immigration relief program known as Deferred Action for Childhood Arrivals (DACA), which allows certain individuals without legal immigration status who arrived in the United States as children to apply for a two-year forbearance of removal. Those granted such relief become eligible for work authorization and various federal benefits. Individuals who meet the program criteria are eligible for relief from removal and the associated benefits "whether or not [they are] already in removal proceedings or subject to a final order of removal." Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012). Some 700,000 aliens have availed themselves of this opportunity.

13. Since 2012, agency guidance has outlined the process for detained individuals to seek relief from removal through DACA. *See, e.g.,* Exh. 5I, DHS Guidance on DACA. The guidance clearly states that once these individuals identify themselves to their deportation officer (DO), the DO "will review [the] case along with the local Office of the Chief Counsel." *Id*. The guidance then further provides that, "[i]f [an individual] appear[s] to meet the DACA . . . requirements, [he or she] may be released on an alternative form of supervision to allow [him or her] to pursue [his or her] case with U.S. Citizenship and Immigration Services (USCIS)." *Id*. Finally, the guidance unequivocally states that "appropriate action will be taken in a timely manner" when a detained individual raises his or her DACA eligibility to ICE. *Id*.

14. Two years later, DHS expanded DACA eligibility and created a related program known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). If implemented, that program would have made 4.3 million parents of U.S. citizens or lawful permanent residents eligible for the same forbearance from removal, work eligibility,

6

and other benefits as DACA recipients.

15. The State of Texas, joined by 25 other States, secured a nationwide preliminary injunction barring implementation of both the DACA expansion and DAPA. The Fifth Circuit upheld the injunction, concluding that the program violated the Immigration and Nationality Act (INA), which defines eligibility for benefits. The U.S. Supreme Court affirmed by an equally divided vote, and the litigation then continued in the District Court.

16. In June 2017, following a change in Presidential administrations, DHS rescinded the DAPA Memorandum, citing, among other reasons, the ongoing suit by Texas and new policy priorities.

17. That September, the Attorney General advised Acting Secretary of Homeland Security Elaine C. Duke that DACA shared DAPA's legal flaws and should also be rescinded.

18. The next day, Duke acted on that advice. Taking into consideration the Fifth Circuit and Supreme Court rulings and the Attorney General's letter, Duke decided to terminate the program. She explained that DHS would no longer accept new applications, but that existing DACA recipients whose benefits were set to expire within six months could apply for a two-year renewal. For all other DACA recipients, previously issued grants of relief would expire on their own terms, with no prospect for renewal.

19. Several groups of plaintiffs challenged Duke's decision to rescind DACA, claiming that it was arbitrary and capricious in violation of the Administrative Procedure Act (APA) and infringed the equal protection guarantee of the Fifth Amendment's Due Process Clause. District Courts in California (*Regents*, No. 18–587), New York (*Batalla Vidal*, No. 18–589), and the District of Columbia (*NAACP*, No. 18–588) all ruled for the plaintiffs. Each court rejected the Government's arguments that the claims were unreviewable under the APA and that the INA deprived the courts of jurisdiction. In *Regents* and *Batalla Vidal*, the District

Courts further held that the equal protection claims were adequately alleged, and they entered coextensive nationwide preliminary injunctions based on the conclusion that the plaintiffs were likely to succeed on their APA claims. The District Court in *NAACP* took a different approach. It deferred ruling on the equal protection challenge but granted partial summary judgment to the plaintiffs on their APA claim, finding that the rescission was inadequately explained. The court then stayed its order for 90 days to permit DHS to reissue a memorandum rescinding DACA, this time with a fuller explanation of the conclusion that DACA was unlawful.

20. Two months later, Duke's successor, DHS Secretary Kirstjen M. Nielsen, responded to the *NAACP* court's order. She declined to disturb or replace Duke's rescission decision and instead explained why she thought her predecessor's decision was sound. In addition to reiterating the illegality conclusion, she offered several new justifications for the rescission.

21. The Government moved for the *NAACP* District Court to reconsider in light of this additional explanation, but the court concluded that the new reasoning failed to elaborate meaningfully on the illegality rationale and left its prior ruling undisturbed.

22. The Government appealed the various District Court decisions to the Second, Ninth, and D.C. Circuits, respectively. While those appeals were pending, the Government filed three petitions for certiorari before judgment with the Supreme Court. Following the Ninth Circuit affirmance in *Regents*, the Supreme Court granted certiorari.

23. On June 18, 2020, the Supreme Court held that DHS's rescission of DACA violated the Administrative Procedure Act (APA) and that the rescission "must be vacated." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 18-587, 2020 WL 3271746, at *3 (U.S. June 18, 2020).

24. At the time of the *Regents* decision, a separate challenge to the rescission of DACA was pending before the United States District Court for the District of Maryland, on remand from the Fourth Circuit Court of Appeals. *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684 (4th Cir. 2019).

25. On July 17, 2020, in accordance with the Supreme Court's decision in *Regents* and the judgment of the Fourth Circuit Court of Appeals, the United States District Court for the District of Maryland officially vacated the rescission of DACA and restored the program to its pre-rescission status. *Casa de Maryland v. Dept. of Homeland Sec.*, No. 8:17-cv-02942-PWG (D. Md. July 17, 2020), ECF No. 97.

26. On July 28, 2020, Acting Secretary of Homeland Security Chad Wolf issued a memorandum rescinding previous promulgations concerning DHS's stance on DACA and announcing certain immediate changes to the DACA program pending his full reconsideration of the policy. Memorandum from Chad F. Wolf, Acting Secretary, DHS, to Mark Morgan, Senior Official Performing the Duties of Comm'r, CBP, et al., "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals who came to the United States as Children'," (July 28, 2020). Among the immediate changes, Acting Secretary Wolf announced that DHS would reject all initial DACA applications and associated applications for Employment Authorization Documents. He expressly stated that this categorical rejection of initial DACA applications would apply both to applications submitted after the issuance of this memorandum and to applications that were already pending before USCIS at the time the memorandum was issued.

**The History of Plaintiff Nylssa Portillo Moreno's Time in the United States**

27. Ms. Portillo Moreno was born in 1984, in San Salvador, El Salvador. Exh. 2A, Declaration of Nylssa Krysthella Portillo Moreno, at 2, ¶ 1. She is a citizen of El Salvador.

9

She arrived in the U.S. before her 9th birthday and has lived here ever since. *Id*. at 2, ¶¶ 1-2.

28.     Ms. Portillo Moreno entered the U.S. near Brownsville, Texas, on or about January 8, 1993. *Id*. at 2, ¶ 1.

29.     At that point, her mother, Gloria Moreno McCartey, had just been released from the Port Isabel Detention Center and had already begun her deportation proceedings in Harlingen, Texas. Id. at 2, ¶ 2. Ms. Portillo Moreno, still just 8 years old, was added to those proceedings. *Id*.

30.     On April 16, 1993, the Immigration Judge (IJ) denied Ms. Portillo Moreno's mother's applications for relief and ordered both mother and Ms. Portillo Moreno deported. Exh. 8, February 3, 2020 Order Denying Ms. Portillo Moreno's Motion to Reopen at 362.

31.     Ms. Portillo Moreno has no recollection of these proceedings and, in fact, did not learn of her deportation order until more than 20 years later, when she was taken into DHS custody. Exh. 2A at 2-3, ¶¶ 2-3, 9.

32.     In her nearly 30 years in the U.S., Ms. Portillo Moreno has attended grade school and community college, earned her GED, gained and lost Temporary Protected Status (TPS), started a small business, survived cancer, and cared for her aging mother. *Id*. at 2-4, ¶¶ 4-8, 15.

33.     In and around 1999, her stepfather, a U.S. citizen, filed a family petition for Ms. Portillo Moreno and her mother so that they could obtain permanent residency. *Id*. at 2, ¶ 5. Her stepfather passed away shortly before their final interview, and Ms. Portillo Moreno and her mother were told that they were no longer eligible for residency. *Id*.

34.     After that, Ms. Portillo Moreno and her mother sought and received TPS. *Id*. They renewed it several times, but eventually they never received another renewal in the mail, for reasons Ms. Portillo Moreno still does not understand. *Id*. Her status expired in 2010. *Id*.

10

35. Ms. Portillo Moreno started a small business providing professional services to other small businesses. *Id*. at 2-3, ¶ 6.

36. Last year, Ms. Portillo Moreno was arrested on false theft allegations, and the charges were quickly dismissed. *Id*. at 3, ¶ 9. Then ICE took her into custody to execute her 1993 deportation order, which she learned of for the first time then. *Id*.

**Plaintiff's Pending DACA Application**

37. Ms. Portillo Moreno raised her DACA eligibility to her Deportation Officer (DO) Arturo Gonzalez, in a custody redetermination request, dated June 30, 2020. She requested release from ICE custody in order to pursue her DACA case with USCIS, pursuant to the ICE Guidance on DACA. Exh. 5I, DHS Guidance on DACA.

38. Ms. Portillo Moreno's June 30 custody redetermination request was denied on July 2, 2020 because the local Office of the Chief Counsel (OCC) determined that USCIS had not yet begun accepting initial DACA applications.

39. On July 7, 2020, Ms. Portillo Moreno submitted a DACA application to USCIS. The application was scheduled to arrive at the USCIS office at 10:30 am on July 8, 2020, and the FedEx website confirms it was delivered on time. Attachment 2, Declaration of Maura Smyles at 8.

40. On July 17, 2020, the same day the *Casa de Maryland* order officially vacated the rescission of DACA and restored the program to its pre-rescission terms, Ms. Portillo Moreno's counsel contacted her DO by email and again raised Ms. Portillo Moreno's DACA eligibility and requested her release to pursue her DACA application before USCIS. Attachment 2, Declaration of Maura Smyles at 8.

41. As of today's date, ICE has not provided Ms. Portillo Moreno or her counsel of record with information about steps it has taken to comply with the ICE Guidance on DACA

11

or about the grounds for denying Ms. Portillo Moreno's release request in light of the court order that restored the DACA program to its pre-rescission terms. *Id.*

42. USCIS has yet to notify Ms. Portillo Moreno or her counsel of record about the status of her pending DACA application. *Id.*

43. The July 28, 2020 memorandum from the Acting Secretary of DHS ostensibly constitutes a formal declination of Ms. Portillo Moreno's DACA application. Memorandum from Chad F. Wolf, Acting Secretary, DHS, to Mark Morgan, Senior Official Performing the Duties of Comm'r, CBP, et al., "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals who came to the United States as Children'," (July 28, 2020).

**Invalid Agency Appointments**

44. During the period when the Wolf memo was developed, approved, and published, DHS was not led by a lawfully serving Secretary. The Office was—and is—by law required to remain vacant, so no action, function or duty of the Office may be performed during such vacancy. Only a properly serving Secretary or Acting Secretary of Homeland Security, could promulgate the Wolf memo. The Department of Homeland Security contends that Mr. Chad Wolf is its Acting Secretary, but Mr. Wolf has been serving in an acting capacity for longer than the law allows. His actions, including rescission of DACA, do not carry the force of law. The Wolf memo is therefore invalid for this independent reason.

    **A. The Law of Federal Appointments and Vacancies**

45. Pursuant to the Appointments Clause of the U.S. Constitution, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers, of the United States" though Congress may "by Law vest the Appointment of such inferior Officers as they think proper, in the President alone, in the Courts of Law, or in the

Heads of the Departments." U.S. Const. art. II, § 2, cl. 2.

46. The Appointments Clause "serves both to curb Executive abuses of the appointment power . . . and to promote a judicious choice of persons for filling the offices of the union." *Edmond v. United States*, 520 U.S. 651, 659 (1997) (internal quotations marks and alterations omitted).

47. The Federal Vacancies Reform Act, 5 U.S.C. § 3345 et seq. ("FVRA"), is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate" ("PAS Positions"), unless a statute provides otherwise. 5 U.S.C. § 3347(a).

48. The FVRA limits who may serve as the acting head of an agency "[i]f an officer of an Executive agency . . . whose appointment . . . is required to be made by the President, by and with the advice and consent of the Senate . . . resigns." Id. § 3345(a).

49. When a vacancy occurs, the "first assistant to the office" becomes the acting official. Id. § 3345(a)(1). Alternatively, the President may choose as the acting official a person who serves in a different PAS Position or who spent at least 90 of the 365 days preceding the vacancy working in a federal government job paid at or above the GS-15 level of the General Schedule. Id. § 3345(a)(2)–(3).

50. The FVRA also limits the duration an office may be filled by an acting official. In general, "the person serving as an acting officer . . . may serve in the office . . . for no longer than 210 days beginning on the date the vacancy occurs." See id. § 3346.

51. While the FVRA provides for certain modifications of that time limit based upon either the submission of a nomination to the Senate or the pendency of a Presidential Transition, or both, the FVRA does not provide for restarting of the 210-day period due to a

change in acting appointee.

52. If there is not an FVRA-compliant official in place to perform the functions and duties of a PAS Position, the FVRA requires that "the office shall remain vacant." Id. § 3348(b)(1).

53. Further, the FVRA provides that any action taken by an official who occupies the position contrary to the FVRA "shall have no force or effect." Id. § 3348(d)(2). Such actions "may not be ratified." *Id*.

54. The Director of USCIS is a PAS Position; any vacancy must be filled pursuant to the FVRA.

55. When the Office of the Secretary of Homeland Security is vacant, the President lacks the authority to select an acting officer from the FVRA's categories of officials. Rather, DHS statute provides that vacancies in the Secretary of Homeland Security's Office are to be filled by the Deputy Secretary of Homeland Security and then, if that Office is likewise vacant, by the Under Secretary for Management. 6 U.S.C. § 113(a)(1)(A), (g)(1). Where the Offices of both the Deputy Secretary of Homeland Security and Under Secretary for Management are vacant, DHS statute provides the option of a Secretary-established order of succession. Id. § 113(g)(2). Setting or amending the order of succession is an action, function or duty of the Office of the Secretary of Homeland Security. See id. (authorizing "the Secretary" of Homeland Security to establish an order of succession beyond the Under Secretary for Management); 5 U.S.C. § 3348(a) (defining "action," "function or duty" for purposes of the FVRA).

56. DHS has established multiple orders of succession and/or delegations pertaining to the Office of the Secretary and other DHS positions. Those documents are contained in a broader directive, entitled DHS Orders of Succession and Delegations of

Authorities for Named Positions, Dep't of Homeland Security, Delegation No. 00106, Revision No. 08.5 (Dec. 15, 2016) (the "DHS Orders,").

57. From at least December 15, 2016, through and beyond April 11, 2019, Section II.A of the DHS Orders stated in full that: "In case of the Secretary's death, *resignation*, or inability to perform the functions of the Office, *the orderly succession of officials is governed by Executive Order 13753*, amended on December 9, 2016." *Id*. (emphases added).

58. Executive Order 13753, in turn, sets the order of succession at DHS in cases of resignation of the Secretary. That Order establishes that succession to the Acting Secretary role must be, in order:

> a. Deputy Secretary of Homeland Security;
>
> b. Under Secretary for Management;
>
> c. Administrator of the Federal Emergency Management Agency;
>
> d. Under Secretary for National Protection and Programs;
>
> e. Under Secretary for Science and Technology;
>
> f. Under Secretary for Intelligence and Analysis; and
>
> g. Commissioner of U.S. Customs and Border Protection.

59. From at least December 15, 2016, through and beyond April 11, 2019, Section II.B of the DHS Orders additionally provided: "I [Secretary of Homeland Security] hereby delegate to the officials occupying the identified positions *in the order listed ([at] Annex A)*, my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, *in the event I am unavailable to act during a disaster or catastrophic emergency*." DHS Orders § II.B (emphases added).

60. As of April 10, 2019, Annex A, which, on the face of the DHS Orders, applied only when the Secretary is "unavailable to act during a disaster or catastrophic emergency,"

placed the Commissioner of U.S. Customs and Border Protection third, behind the Deputy Secretary of Homeland Security and the Under Secretary for Management. DHS Orders, Annex A.

61.     If, however, the Secretary of Homeland Security resigned, the Commissioner of U.S. Customs and Border Protection remained seventh in the standard order of succession. *See* Executive Order 13753 § 1.

62.     On or about April 9 or 10, 2019, then-Secretary of Homeland Security Kirstjen Nielsen issued an amendment to Annex A ("April 2019 Amendment").[1] That April 2019 Amendment did not direct any changes to the text of Section II.A of the DHS Orders. Thus, after faithfully and fully applying the April 2019 Amendment, Section II.A of the DHS Orders still required following Executive Order 13753 for succession in the event of a Secretary's resignation, and Executive Order 13753 still provided that the Commissioner of U.S. Customs and Border Protection was seventh in succession if the Secretary resigned. *See* DHS Orders § II.A; Executive Order 13753 § 1.

63.     The April 2019 Amendment likewise did not direct any change to the text of Section II.B of the DHS Orders. Thus, after faithfully and fully applying the April 2019 Amendment, Section II.B continued to identify the sole purpose of Annex A: Annex A is to be applied only in limited circumstances and only to delegate the Secretary's authority when the Secretary is "unavailable to act during a disaster or catastrophic emergency." DHS Orders § II.B. Annex A thus did not—and does not—apply to succession in the case of resignation of the Secretary of Homeland Security.

---

[1] On or around April 9 or 10, 2019, Ms. Nielsen signed an Amendment to the DHS Orders. The only action directed by that Amendment was to "strik[e] the text of such Annex [A] in its entirety and insert" a different list of positions "in lieu thereof." The inserted text listed the Commissioner of U.S. Customs and Border Protection third behind the Deputy Secretary of Homeland Security and Under Secretary for Management. The Amendment to Annex A labeled and identified the Annex not as an "order of succession," but instead as an "order for delegation of authority." Id. (F-2).

16

**B. Purported Appointment of the Secretary of Homeland Security**

64. Then-secretary of Homeland Security Kristjen Nielson announced her resignation on April 7, 2019. She departed her Office by April 10, 2019.

65. As of this Complaint's filing, the President has not submitted a nomination for the vacancy created by Secretary Nielsen's resignation.

66. At the time of Secretary Nielsen's resignation, Senate-confirmed appointees held the Offices of Under Secretary for National Protection and Programs and Under Secretary for Intelligence and Analysis.

67. Kevin McAleenan, then serving as the Commissioner of U.S. Customs and Border Protection, was therefore ineligible at the time of Secretary Nielsen's resignation to become Acting Secretary of Homeland Security under Section II.A of the DHS Orders.

68. Mr. McAleenan would have been next in line only under Section II.B of the DHS Orders, which applied only if the Secretary's unavailability occurred due to a "disaster or catastrophic emergency." Section II.B did not apply at the time of Secretary Nielsen's resignation, because resignation was the basis for her unavailability.

69. Mr. McAleenan therefore never validly served as the Acting Secretary of Homeland Security following Secretary Nielsen's resignation. He also exceeded the 210-day maximum for acting-official service under the FVRA. He served as the purported Acting Secretary through November 13, 2019, a period of 216 days.

70. On November 8, 2019, the 211th day of Mr. McAleenan's purported tenure, he issued a directive (attached hereto as Exhibit G), attempting to amend the order of succession for the Secretary of Homeland Security to elevate Under Secretary for Strategy, Policy, and Plans to be fourth in line to lead the agency. Unlike Secretary Nielsen's April 2019 Amendment, Mr. McAleenan did purport to change Section II.A of the DHS Orders such that,

17

like Section II.B, it would now rely upon Annex A to establish the order of succession; thus Annex A for the first time would apply in the case of resignation by the Secretary of Homeland Security. See Amendment to the Order of Succession for the Secretary of Homeland Security (G-1). Mr. McAleenan's attempted change would have been superfluous if Annex A had otherwise already applied in the case of resignations.

71. Mr. McAleenan likewise purported to change the order of the positions listed in Annex A, moving the position of Under Secretary for Strategy, Policy, and Plans to fourth in line, behind only the then-vacant Offices of Deputy Secretary of Homeland Security and Under Secretary for Management, as well as the Office then held by Mr. McAleenan, Commissioner of U.S. Customs and Border Protection. Id.

72. Mr. McAleenan's attempted directive was without force of law because Mr. McAleenan was invalidly serving under the applicable DHS order of succession or because he had exceeded the time limit for acting-official service set forth in the FVRA.[2]

73. Mr. McAleenan thereafter resigned. Relying on Mr. McAleenan's invalid succession directive, Chad Wolf, then recently confirmed as Under Secretary for Strategy, Policy, and Plans, purported to become Acting Secretary of Homeland Security.

74. Mr. Wolf could not have served as Acting Secretary of Homeland Security, however, because Mr. McAleenan was without authority to make changes to DHS's succession order.

75. Mr. Wolf could not have served as Acting Secretary under the FVRA because the 210-day limit on such service expired before he purported to assume the Office.

---

[2] The untimely change to DHS's succession order was invalid even if the FVRA's 210-day limit does not apply to vacancies filled by order of succession designated by other statutes. If Mr. McAleenan was appointed under the FVRA, the 210-day limit necessarily applied. If he was appointed under DHS's succession order, he was not next in line and thus never validly held the Acting Secretary position.

76. Mr. Wolf could not have served as Acting Secretary under any DHS succession order because he was not next in any applicable order of succession except Mr. McAleenan's invalid directive.

77. DHS did not then, and does not as of the filing of this Complaint, have a Secretary authorized to assume the duties of subordinate, vacant offices.

## CAUSES OF ACTION

### COUNT I
**(Violation of Due Process Clause of the Fifth Amendment)**

78. All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

79. The Due Process Clause of the U.S. Constitution's Fifth Amendment protects all "persons" on United States soil, including Ms. Portillo Moreno.

80. With DACA restored to its pre-rescission status, Ms. Portillo Moreno should not be detained or subject to deportation while her DACA application is pending. Acting Secretary Wolf's unlawful decision to reject initial DACA applications violates Ms. Portillo Moreno's right to due process. Additionally, DHS' failure to acknowledge, receipt, process, or adjudicate Ms. Portillo Moreno's initial DACA application violates her right to due process.

81. Therefore, Ms. Portillo Moreno's Fifth Amendment right to procedural due process is violated by the execution of the deportation order.

### COUNT II
**(Arbitrary and Capricious Action that Violates the Administrative Procedure Act)**

82. All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

83. The Administrative Procedure Act (APA) prohibits agency action that is arbitrary and capricious and contrary to a Constitutional right.

84. Acting Secretary Wolf does not have the authority to modify DACA eligibility. USCIS' failure to receipt, process, or adjudicate Ms. Portillo Moreno's DACA application is arbitrary and capricious. ICE's failure to apply its pre-2017 DACA guidance to Ms. Portillo Moreno is arbitrary and capricious, Enforcement of the deportation order against Ms. Portillo Moreno based on Acting Secretary Wolf's purported authority is an arbitrary and capricious agency action in violation of the APA.

85. Therefore, enforcement of the deportation order against Ms. Portillo Moreno is an arbitrary and capricious act that violates the Administrative Procedures Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A. Declare that the removal of Ms. Portillo Moreno violates Ms. Portillo Moreno's due process rights;

B. Enjoin Defendants from removing Ms. Portillo Moreno from the United States of America and removing her to El Salvador; and

C. Order all other relief that is just and proper.

Respectfully submitted this 31st day of July, 2020.

/s/ Clayton D. LaForge
Clayton D. LaForge, DC Bar No. 1033938
Claudia M. O'Brien, DC Bar No. 447354
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Washington DC 20004
(202) 637-2200
clayton.laforge@lw.com
claudia.obrien@lw.com