## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NYLSSA KRYSTHELLA PORTILLO-MORENO**,**

        Plaintiff

        v.

CHAD WOLF , et al.,

        Defendants.

Case No. 20-cv-2097

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I.  INTRODUCTION

On June 18, 2020, the Supreme Court held that the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals ("DACA") policy violated the Administrative Procedure Act ("APA") and that the rescission of DACA "must be vacated." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 18-587, 2020 WL 3271746, at \*3 (U.S. June 18, 2020).   Plaintiff, Ms. Nylssa Portillo Moreno, is a DACA-eligible individual whose application for DACA relief has not been addressed by the Department of Homeland Security ("DHS").  Urgently, she is scheduled for removal to El Salvador on August 4, 2020—this coming Tuesday—despite the Department's failure to process the application.

The government's basis for withholding adjudication of her application—effectively, a denial—is a July 28, 2020 memorandum authored by Mr. Chad Wolf, who purports to act with the authority of the Secretary of the Department of Homeland Security.  Mr. Wolf, however, is not vested with legal authority to act as the Secretary of the Department because his appointment and tenure offend the Appointments Clause of the Constitution and the Federal Vacancies Reform Act.  Accordingly, his memorandum is not backed by the force of law, and the Supreme Court of the United State's decision in *Regents* and developing progeny—at this juncture—dictate that Ms. Portillo Moreno's application be considered.  Because she is scheduled for removal on August 4, 2020, harm is imminent, and Ms. Portillo Moreno respectfully requests a temporary restraining order holding that Mr. Wolf has acted unlawfully and that the Department of Homeland Security must comply with the Supreme Court's directives in *Regents* and enjoining her removal from the United States.

## II.  FACTUAL BACKGROUND

**A.      The History of Legal Challenges to the Deferred Action for Childhood Arrivals Memorandum[1]**

In 2012, the Department of Homeland Security ("DHS") issued a memorandum announcing an immigration relief program known as DACA, which allows certain individuals without legal immigration status who arrived in the United States as children to apply for a two-year forbearance of removal. Those granted such relief become eligible for work authorization and various federal benefits. Individuals who meet the program criteria are eligible for relief from removal and the associated benefits "whether or not [they are] already in removal proceedings or subject to a final order of removal." Memorandum from Janet Napolitano, Secretary, DHS, to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012). Some 700,000 individuals have availed themselves of this opportunity.

Since 2012, agency guidance has outlined the process for detained individuals to seek relief from removal through DACA. *See, e.g.,* Exh. 5I, DHS Guidance on DACA. The guidance states that once these individuals identify themselves to their deportation officer ("DO"), the DO "will review [the] case along with the local Office of the Chief Counsel." *Id*. The guidance provides that, "[i]f [an individual] appear[s] to meet the DACA … requirements, [he or she] may be released on an alternative form of supervision to allow [him or her] to pursue [his or her] case with U.S. Citizenship and Immigration Services (USCIS)." *Id*. Finally, the guidance

---

[1] The history of DACA and challenges in the federal judiciary are thoroughly discussed in the Supreme Court's recent opinion, *Department of Homeland Security v. Regents of the University of California*, No. 18-587, 2020, WL 3271746, at *1-4 (U.S. June 18, 2020). Unless otherwise noted through citations, the discussion of the history of DACA is taken from the Court's opinion either verbatim or near-verbatim.

unequivocally states that "appropriate action will be taken in a timely manner" when a detained individual raises his or her DACA eligibility to ICE. *Id*.

Two years later, DHS expanded DACA eligibility and created a related program known as the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). If implemented, that program would have made 4.3 million parents of U.S. citizens or lawful permanent residents eligible for the same forbearance from removal, work eligibility, and other benefits as DACA recipients.

The State of Texas, joined by 25 other States, secured a nationwide preliminary injunction barring implementation of both the DACA expansion and DAPA. The Fifth Circuit upheld the injunction, concluding that the program violated the Immigration and Nationality Act ("INA"), which carefully defines eligibility for benefits. The Supreme Court affirmed by an equally divided vote, and the litigation then continued in the District Court.  In June 2017, following a change in Presidential administrations, DHS rescinded the DAPA Memorandum, citing, among other reasons, the ongoing suit by Texas and new policy priorities.

That September, the Attorney General advised Acting Secretary of Homeland Security Elaine C. Duke that DACA shared DAPA's legal flaws and should also be rescinded. The next day, Duke acted on that advice. Taking into consideration the Fifth Circuit and Supreme Court rulings and the Attorney General's letter, Duke decided to terminate the program. She explained that DHS would no longer accept new applications, but that existing DACA recipients whose benefits were set to expire within six months could apply for a two-year renewal. For all other DACA recipients, previously issued grants of relief would expire on their own terms, with no prospect for renewal.

Several groups of plaintiffs challenged Duke's decision to rescind DACA, claiming that

it was arbitrary and capricious in violation of the APA and infringed the equal protection guarantee of the Fifth Amendment's Due Process Clause. District Courts in California, New York, and the District of Columbia all ruled for the plaintiffs. Each court rejected the Government's arguments that the claims were unreviewable under the APA and that the INA deprived the courts of jurisdiction. In *Regents* and *Batalla Vidal*, the District Courts further held that the equal protection claims were adequately alleged, and they entered coextensive nationwide preliminary injunctions based on the conclusion that the plaintiffs were likely to succeed on their APA claims. The District Court in *NAACP* took a different approach. It deferred ruling on the equal protection challenge but granted partial summary judgment to the plaintiffs on their APA claim, finding that the rescission was inadequately explained. The court then stayed its order for 90 days to permit DHS to reissue a memorandum rescinding DACA, this time with a fuller explanation of the conclusion that DACA was unlawful.

Two months later, Duke's successor, DHS Secretary Kirstjen M. Nielsen, responded to the *NAACP* court's order. She declined to disturb or replace Duke's rescission decision and instead explained why she thought her predecessor's decision was sound. In addition to reiterating the illegality conclusion, she offered several new justifications for the rescission. The Government moved for the District Court to reconsider in light of this additional explanation, but the court concluded that the new reasoning failed to elaborate meaningfully on the illegality rationale and left its prior ruling undisturbed.

The Government appealed the various District Court decisions to the Second, Ninth, and D.C. Circuits, respectively. While those appeals were pending, the Government filed three petitions for certiorari before judgment. Following the Ninth Circuit affirmance, the Supreme Court granted certiorari. On June 18, 2020, the Supreme Court held that DHS's rescission of

DACA violated the APA and that the rescission of DACA "must be vacated." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 18-587, 2020 WL 3271746, at *3 (U.S. June 18, 2020).

At the time of the *Regents* decision, a separate challenge to the rescission of DACA was pending before the United States District Court for the District of Maryland, on remand from the Fourth Circuit Court of Appeals. *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684 (4th Cir. 2019). On July 17, 2020, in accordance with the Supreme Court's decision in *Regents* and the judgment of the Fourth Circuit Court of Appeals, the United States District Court for the District of Maryland vacated the rescission of DACA and restored the program to its pre-rescission status. *Casa de Maryland v. Dept. of Homeland Sec*., No. 8:17-cv-02942-PWG (D. Md. July 17, 2020), ECF No. 97.

On July 28, 2020, Acting Secretary of Homeland Security Chad Wolf issued a memorandum rescinding previous promulgations concerning DHS's stance on DACA and announcing certain immediate changes to the DACA program pending his full reconsideration of the policy. Memorandum from Chad F. Wolf, Acting Secretary, DHS, to Mark Morgan, Senior Official Performing the Duties of Comm'r, CBP, et al., "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals who came to the United States as Children'," (July 28, 2020). Among the immediate changes, Acting Secretary Wolf announced that DHS would reject all initial DACA applications and associated applications for employment authorization documents. *Id*. He expressly stated that this categorical rejection of initial DACA applications would apply both to applications submitted after the issuance of this memorandum and to applications that were already pending before USCIS at the time the memorandum was issued. *Id*.

**B.  The History of Ms. Portillo Moreno's Time in the United States**

Ms. Portillo Moreno was born in 1984, in San Salvador, El Salvador. Exh. 2A,

Declaration of Nylssa Krysthella Portillo Moreno, at 2, ¶ 1. She is a citizen of El Salvador. She arrived in the United States before her ninth birthday and has lived here ever since. *Id*. at 2, ¶¶ 1-2. Ms. Portillo Moreno entered the United States near Brownsville, Texas, on or about January 8, 1993. *Id*. at 2, ¶ 1.

In 1993, her mother, Gloria Moreno McCartey, was released from the Port Isabel Detention Center and began her deportation proceedings in Harlingen, Texas. *Id*. at 2, ¶ 2. Ms. Portillo Moreno, still just eight years old, was included in those proceedings. *Id*. On April 16, 1993, the immigration judge denied Ms. Portillo Moreno's mother's applications for relief and ordered both mother and daughter deported. Exh. 8, February 3, 2020 Order Denying Plaintiff Portillo Moreno's Motion to Reopen at 362. Ms. Portillo Moreno has no recollection of these proceedings and, in fact, did not learn of her deportation order until more than 20 years later. Exh. 2A at 2-3, ¶¶ 2-3, 9.

In 1999, her stepfather, a United States citizen, petitioned for lawful permanent residency for Ms. Portillo Moreno and her mother. *Id*. at 2, ¶ 5. He passed away shortly before their final interview, and the adjudicator told her and her mother that they could not continue the case. *Id*. Ms. Portillo Moreno and her mother then sought and received Temporary Protected Status ("TPS"). *Id*. Ms. Portillo Moreno and her mother renewed their TPS several times, but eventually they did not receive another renewal in the mail, for reasons Ms. Portillo Moreno still does not understand. *Id*. Their status expired in 2010. *Id*.

In her nearly 30 years in the United States, Ms. Portillo Moreno has attended grade school and community college, earned her GED, gained and lost TPS, started a small business, survived cancer, and cared for her aging mother. *Id*. at 2-4, ¶¶ 4-8, 15.  Ms. Portillo Moreno started a small business providing professional services to other small businesses. *Id*. at 2-3, ¶ 6.

Last year, Ms. Portillo Moreno was arrested on meritless theft allegations, and the charges were quickly dismissed. *Id*. at 3, ¶ 9. The Government used this meritless arrest to take her into custody to execute her 1993 deportation order. *Id*.  She is now incarcerated in Laredo, Texas and her removal is scheduled for August 4, 2020—this coming Tuesday.

### C.  Plaintiff's Pending DACA Application

Ms. Portillo Moreno raised her DACA eligibility to her Deportation Officer ("DO") Arturo Gonzalez, in a custody redetermination request, dated June 30, 2020. Exh. 2C, Custody Redetermination Request, as Filed with ICE 38-45 on June 30, 2020. She requested release from federal custody to pursue her DACA case, pursuant to the DHS guidance. Exh. 5I, ICE Guidance on DACA.  Ms. Portillo Moreno's June 30 custody redetermination request was denied on July 2, 2020, because the local Office of the Chief Counsel (OCC) determined that DHS was not accepting initial DACA applications.  Exh. 2B, Declaration of Maura Smyles at 23. Nevertheless, on July 7, 2020, Ms. Portillo Moreno submitted a DACA application to DHS. The application was scheduled to arrive at the USCIS office at 10:30 am on July 8, 2020, and the FedEx website confirms it was delivered on time. Attachment 2, Declaration of Maura Smyles at 8.

On July 17, 2020, the same day the *Casa de Maryland* order officially vacated the rescission of DACA and restored the program to its pre-rescission terms, Ms. Portillo Moreno's counsel contacted her DO by email and again raised Ms. Portillo Moreno's DACA eligibility and requested her release to pursue her DACA application before DHS. Exh. 2B, Declaration of Maura Smyles at 34. DHS has not provided Ms. Portillo Moreno or her counsel of record with information about steps it has taken to comply with the DHS's Guidance on DACA or about the grounds for denying Ms. Portillo Moreno's release request in light of the court order that restored the DACA program to its pre-rescission terms.  The July 28, 2020 memorandum from the Acting Secretary of DHS ostensibly constitutes a formal declination of Ms. Portillo Moreno's DACA

application. Memorandum from Chad F. Wolf, Acting Secretary, DHS, to Mark Morgan, Senior

Official Performing the Duties of Comm'r, CBP, et al., "Reconsideration of the June 15, 2012

Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals who

came to the United States as Children'," (July 28, 2020).

### D. Mr. Wolf's Status as Acting Secretary of the Department of Homeland Security

#### i. The Law of Federal Appointments and Vacancies

The Appointments Clause of the Constitution states that the President "shall nominate,

and by and with the Advice and Consent of the Senate, shall appoint . . . Officers, of the United

States" though Congress may "by Law vest the Appointment of such inferior Officers as they

think proper, in the President alone, in the Courts of Law, or in the Heads of the Departments."

U.S. Const. art. II, § 2, cl. 2. The Appointments Clause "serves both to curb Executive abuses of

the appointment power . . . and to promote a judicious choice of persons for filling the offices of

the union." *Edmond v. United States*, 520 U.S. 651, 659 (1997) (internal quotations marks and

alterations omitted).

The Federal Vacancies Reform Act, 5 U.S.C. §§ 3345-3349 ("FVRA"), is the "exclusive

means for temporarily authorizing an acting official to perform the functions and duties of any

office of an Executive agency . . . for which appointment is required to be made by the President,

by and with the advice and consent of the Senate" ("PAS Positions"), unless a statute provides

otherwise. 5 U.S.C. § 3347(a).

The FVRA limits who may serve as the acting head of an agency "[i]f an officer of an

Executive agency . . . whose appointment . . . is required to be made by the President, by and with

the advice and consent of the Senate . . . resigns." *Id*. § 3345(a). When a vacancy occurs, the "first

assistant to the office" becomes the acting official. *Id*. § 3345(a)(1). Alternatively, the President

may choose as the acting official a person who serves in a different PAS Position or who spent at least 90 of the 365 days preceding the vacancy working in a federal government job paid at or above the GS-15 level of the General Schedule. *Id.* § 3345(a)(2)–(3).

The FVRA also limits the duration an office may be filled by an acting official. In general, "the person serving as an acting officer . . . may serve in the office . . . for no longer than 210 days beginning on the date the vacancy occurs." *See id.* § 3346. While the FVRA provides for certain modifications of that time limit based upon either the submission of a nomination to the Senate or the pendency of a Presidential Transition, or both, the FVRA does not provide for restarting of the 210-day period due to a change in acting appointee. If there is not an FVRA-compliant official in place to perform the functions and duties of a PAS Position, the FVRA requires that "the office shall remain vacant." *Id.* § 3348(b)(1).

Further, the FVRA provides that any action taken by an official who occupies the position contrary to the FVRA "shall have no force or effect." Id. § 3348(d)(2). Such actions "may not be ratified." Id. The Director of USCIS is a PAS Position; any vacancy must be filled pursuant to the FVRA.

When the Office of the Secretary of Homeland Security is vacant, the President lacks the authority to select an acting officer from the FVRA's categories of officials. Rather, the law provides that vacancies in the Secretary of Homeland Security's Office are to be filled by the Deputy Secretary of Homeland Security and then, if that Office is likewise vacant, by the Under Secretary for Management. 6 U.S.C. § 113(a)(1)(A), (g)(1). Where the offices of both the Deputy Secretary of Homeland Security and Under Secretary for Management are vacant, the law provides the option of a Secretary-established order of succession. *Id.* § 113(g)(2). Setting or amending the order of succession is an action, function or duty of the Office of the Secretary of

Homeland Security. *See id.* (authorizing "the Secretary" of Homeland Security to establish an order of succession beyond the Under Secretary for Management); 5 U.S.C. § 3348(a) (defining "action," "function or duty" for purposes of the FVRA).

DHS has established multiple orders of succession and/or delegations pertaining to the Office of the Secretary and other DHS positions. Those documents are contained in a broader directive, entitled DHS Orders of Succession and Delegations of Authorities for Named Positions, Dep't of Homeland Security, Delegation No. 00106, Revision No. 08.5 (Dec. 15, 2016). From at least December 15, 2016, through and beyond April 11, 2019, Section II.A of the DHS Orders stated in full that: "In case of the Secretary's death, *resignation*, or inability to perform the functions of the Office, *the orderly succession of officials is governed by Executive Order 13753*, amended on December 9, 2016." *Id.* (emphases added).

Executive Order 13753, in turn, set the order of succession at DHS in cases of resignation of the Secretary. That Order establishes that succession to the Acting Secretary role must be, in order:

> a. Deputy Secretary of Homeland Security;
>
> b. Under Secretary for Management;
>
> c. Administrator of the Federal Emergency Management Agency;
>
> d. Under Secretary for National Protection and Programs;
>
> e. Under Secretary for Science and Technology;
>
> f. Under Secretary for Intelligence and Analysis; and
>
> g. Commissioner of U.S. Customs and Border Protection.

From at least December 15, 2016, through and beyond April 11, 2019, Section II.B of the DHS Orders additionally provided: "I [Secretary of Homeland Security] hereby delegate to the

officials occupying the identified positions *in the order listed ([at] Annex A)*, my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, *in the event I am unavailable to act during a disaster or catastrophic emergency*." DHS Orders § II.B (D-1) (emphases added).

As of April 10, 2019, Annex A, which, on the face of the DHS Orders, applied only when the Secretary is "unavailable to act during a disaster or catastrophic emergency," placed the Commissioner of U.S. Customs and Border Protection third, behind the Deputy Secretary of Homeland Security and the Under Secretary for Management. DHS Orders, Annex A. If, however, the Secretary of Homeland Security resigned, the Commissioner of U.S. Customs and Border Protection remained seventh in the standard order of succession. *See* Executive Order 13753 § 1.

On or about April 9 or 10, 2019, then-Secretary of Homeland Security Kirstjen Nielsen issued an amendment to Annex A ("April 2019 Amendment"). That April 2019 Amendment did not direct any changes to the text of Section II.A of the DHS Orders. Thus, after faithfully and fully applying the April 2019 Amendment, Section II.A of the DHS Orders still required following Executive Order 13753 for succession in the event of a Secretary's resignation, and Executive Order 13753 still provided that the Commissioner of U.S. Customs and Border Protection was seventh in succession if the Secretary resigned. *See* DHS Orders § II.A; Executive Order 13753 § 1.

The April 2019 Amendment likewise did not direct any change to the text of Section II.B of the DHS Orders. Thus, after faithfully and fully applying the April 2019 Amendment, Section II.B continued to identify the sole purpose of Annex A: Annex A is to be applied only in limited circumstances and only to delegate the Secretary's authority when the Secretary is "unavailable

to act during a disaster or catastrophic emergency." DHS Orders § II.B. Annex A thus did not—and does not—apply to succession in the case of resignation of the Secretary of Homeland Security.

### ii. Purported Appointment of the Secretary of Homeland Security

Then-secretary of Homeland Security Kristjen Nielson announced her resignation on April 7, 2019. She departed her Office by April 10, 2019, and as of this Memorandum's filing, *see Farewell Message from Secretary Kirstjen M. Nielson*, Department of Homeland Security (Apr. 10, 2019), https://www.dhs.gov/news/2019/04/10/farewell-message-secretary-kirstjen-m-nielsen, and the President has not submitted a nomination for the vacancy created by Secretary Nielsen's resignation[2].

At the time of Secretary Nielsen's resignation, Senate-confirmed appointees held the Offices of Under Secretary for National Protection and Programs and Under Secretary for Intelligence and Analysis. Kevin McAleenan, then serving as the Commissioner of U.S. Customs and Border Protection, was therefore ineligible at the time of Secretary Nielsen's resignation to become Acting Secretary of Homeland Security under Section II.A of the DHS Orders. Mr. McAleenan would have been next in line only under Section II.B of the DHS Orders, which applied only if the Secretary's unavailability occurred due to a "disaster or catastrophic emergency." Section II.B did not apply at the time of Secretary Nielsen's resignation, because resignation was the basis for her unavailability.

Mr. McAleenan therefore never validly served as the Acting Secretary of Homeland Security following Secretary Nielsen's resignation. He also exceeded the 210-day maximum for

---

[2] The White House has long been devoted to recommending nominees to serve as Agency Directors and Cabinet Secretaries. For example, and as this court is well aware, there presently are no vacancies in any of the U.S. Courts of Appeals. That said, it appears that the office if presidential personnel is not functioning responsibly. Exh. 7 "Behind the chaos".

acting-official service under the FVRA. He served as the purported Acting Secretary through November 13, 2019, a period of 216 days.

On November 8, 2019, the 211th day of Mr. McAleenan's purported tenure, he issued a directive, attempting to amend the order of succession for the Secretary of Homeland Security to elevate Under Secretary for Strategy, Policy, and Plans to be fourth in line to lead the agency. Unlike Secretary Nielsen's April 2019 Amendment, Mr. McAleenan did purport to change Section II.A of the DHS Orders such that, like Section II.B, it would now rely upon Annex A to establish the order of succession; thus Annex A for the first time would apply in the case of resignation by the Secretary of Homeland Security. *See* Amendment to the Order of Succession for the Secretary of Homeland Security. Mr. McAleenan's attempted change would have been superfluous if Annex A had otherwise already applied in the case of resignations.

Mr. McAleenan likewise purported to change the order of the positions listed in Annex A, moving the position of Under Secretary for Strategy, Policy, and Plans to fourth in line, behind only the then-vacant Offices of Deputy Secretary of Homeland Security and Under Secretary for Management, as well as the Office then held by Mr. McAleenan, Commissioner of U.S. Customs and Border Protection. *Id.* Mr. McAleenan's attempted directive was without force of law because Mr. McAleenan was invalidly serving under the applicable DHS order of succession or because he had exceeded the time limit for acting-official service set forth in the FVRA.

Mr. McAleenan thereafter resigned. Relying on Mr. McAleenan's invalid succession directive, Chad Wolf, then recently confirmed as Under Secretary for Strategy, Policy, and Plans, purported to become Acting Secretary of Homeland Security.  As discussed below, Mr. Wolf could not have served as Acting Secretary of Homeland Security, however, because Mr. McAleenan was without authority to make changes to DHS's succession order, and he was not

in any applicable order of succession except Mr. McAleenan's invalid directive.  To date, Mr. Wolf has also served for over 210 days, meaning that he lacks authority to act as the Secretary of the Department of Homeland Security as well.

Federal courts have begun to grapple with these appointment questions. In a challenge to Mr. Cuccinelli's authority as purported Acting Director of USCIS, this Court found that he "was not lawfully appointed" in violation of the FVRA and that the remedy for his unlawful appointment was to "set aside" directives he issued with his purported authority. *L.M.-M. v. Cuccinelli*, No. 19-cv-2676-RDM, 2020 WL 985376 (D.D.C. Mar. 1, 2020). At least three other challenges, based on the FVRA, are pending in the courts, including two others in this Court challenging Mr. Wolf's appointment: *Don't Shoot Portland v. Wolf*, No. 20-cv-02040 (D.D.C. July 27, 2020) (challenging Mr. Wolf's authority as purported acting Secretary of DHS); *Khudheyer v. Cuccinelli*, No. 20-cv-01882 (D.D.C. July 13, 2020) (challenging Mr. Wolf's authority as purported acting Secretary of DHS and Mr. Cuccinelli's authority as purported acting Director of USCIS); *La Clínica de la Raza v. Trump*, No. 4:19-cv-04980 (N.D. Cal May 20, 2020) (challenging Mr. McAleenan's authority as purported acting Secretary of DHS and Mr. Cuccinelli's authority as purported acting Director of USCIS).

## III. DISCUSSION

A party seeking either a temporary restraining order or a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2009); *Dunlap v. Presidential Advisory Comm'n on Election Integrity,* 319 F. Supp. 3d 70, 81 (D.D.C. 2018) ("An application for a TRO is analyzed

using factors applicable to preliminary injunctive relief."), *rev'd on other grounds*, 944 F.3d 945 (D.C. Cir. 2019).  Courts in the District of Columbia may evaluate these four factors on a "sliding scale" framework, meaning that "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291-92 (D.C. Cir. 2009).

Further, a district court must balance the strength of a plaintiff's arguments in each of the four elements when deciding whether to grant a temporary restraining order or a preliminary injunction. *Id.* If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are weaker. *Id.* Accordingly, an injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury. *Id.*

### A.   Plaintiff is Likely to Succeed on the Merits of Establishing a Constitutional Violation and a Violation of the Administrative Procedures Act.

Ms. Portillo Moreno is likely to succeed on the merits.  Specifically, she is likely to: (1) to establish violation of her rights under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and (2) establish a violation of her procedural Fifth Amendment right to Due Process.

### i.   Enforcement of the Deportation Order Violates Ms. Portillo Moreno's Rights Under the Administrative Procedure Act

Acting Secretary of Homeland Security Wolf does not have the authority to modify DACA eligibility, and enforcement of the deportation order against Ms. Portillo Moreno based on his purported authority is arbitrary and capricious agency action in violation of the APA. Following the *Regents* and *Casa de Maryland* decisions, Mr. Wolf issued a memorandum announcing that DHS would reject all initial DACA applications, including those, like Ms. Portillo Moreno's application, that were pending at the time of the announcement. However, following the resignation of Secretary Nielsen in April 2019, Kevin McAleenan purportedly became Acting

Secretary of Homeland Security. However, Mr. McAleenan was ineligible to become Acting Secretary. *See* 6 U.S.C. § 113(g)(2); DHS Orders § II.A; Executive Order 13753 § 1. Mr. McAleenan's subsequent changes to DHS's succession order were invalid. Moreover, Mr. McAleenan's purported service as Acting Secretary exceeded the 210-day maximum for acting-official service imposed by the FVRA. *See* 5 U.S.C. § 3346. Thus, when Mr. Wolf purportedly succeeded Mr. McAleenan as Acting Secretary, he did so without the force of law. Instead, under the FVRA the office became vacant after the 210-day acting-official period which expired before Mr. Wolf purportedly succeeded to Acting Secretary. *See* 5 U.S.C. § 3348(b)(1).

While the office of Secretary of Homeland Security remains vacant, no action, function or duty of that office may be performed during such vacancy, and given that Mr. Wolf himself has served for longer than 210 days in an acting capacity, he no longer is vested with the authority to lead DHS. *Id.* § 3348(d). Consequently, Ms. Portillo Moreno is likely to succeed on the merits of the FVRA claim.

DHS is likely to contend that the Homeland Security Act, 6 U.S.C. § 113(g)(2), displaces the 210-day limitation in 5 U.S.C. § 3346. This argument offends the basic notion that the Secretary of the Department of Homeland Security requires not only presidential nomination, but the advice and consent of the Senate as well—a proposition so fundamental that neither side can dispute it. Section 113(g)(2) expressly states that, notwithstanding the FVRA, "the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary." This provision gives the *Secretary* the prerogative to only designate officers in further order of succession. It does not attempt to narrow or even define the time limitation necessary to comply with the Appointments Clause. Nor could it—it would be outlandish to suggest that the

Secretary of the Department of Homeland Security is exempt from a constitutional requirement as foundational as Article II, Section 2.

Instead, the statutes should be read in concert. Section 113(g)(2) provides for an alternative method for lining up successors at DHS, but every agency—unless otherwise exempted by date limitations not present in Section 113—is bound by the FVRA's 210-day limit. That logic comports with the Supreme Court's instructions for how courts should construe statutes. *See Maine Community Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("Presented with two statutes, the Court will regard each as effective—unless Congress' intention to repeal [the older provision] is clear and manifest, or the two laws are irreconcilable."; *FCC v. NextWave Personal Communications Inc.*, 537 U.S. 293, 304 (2003) ("When two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."). The strictures in Section 113 and the FVRA should thus co-exist, as Congress intended.

### ii. Ms. Portillo Moreno's Procedural Fifth Amendment Right of Due Process Is Violated by the Execution of the Deportation Order.

The Supreme Court held that DHS's rescission of DACA in September 2017 violated the Administrative Procedure Act and that the rescission "must be vacated." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, at *3 (U.S. June 18, 2020). Shortly after the Supreme Court's decision, the United States District Court for the District of Maryland officially vacated the rescission of DACA and restored the program to its pre-rescission status. *Casa de Maryland v. Dept. of Homeland Sec.*, No. 8:17-cv-02942-PWG (D. Md. July 17, 2020), ECF No. 97.

With DACA restored to its pre-rescission status, Ms. Portillo Moreno should not be detained or subject to deportation while her DACA application is pending. Ms. Portillo Moreno is eligible for DACA, has identified herself as a DACA-eligible person to her DO and requested

release from ICE custody, and has submitted a DACA application to USCIS. Pursuant to ICE Guidance on DACA, Ms. Portillo Moreno is eligible for release from custody to pursue her DACA application before USCIS. Exh. 5I, ICE Guidance on DACA.

To be clear, Ms. Portillo Moreno is not asking the Court to weigh in on the merits of her DACA claim or whether she is removable.  Instead, she asks the Court to effectuate the Supreme Court's directive that the pre-September 2017 standards as set forth by DHS policy are reinstated unless and until DHS complies with administrative law, which it has not done to date because Mr. Wolf is not vested with the authority of the Secretary of the Department of Homeland Security.

Consequently, Ms. Portillo Moreno is entitled to the procedures as enacted before September 2017 unless and until lawful rescission occurs.  Specifically, when ICE officers encounter someone who may be eligible for DACA, the following procedure applies: "Create an event number indicating eligibility under [prosecutorial discretion]]; Issue an A Number with the interview sheet, DACA checklist, short I213, USCIS referral sheet and send the file to USCIS Records. Depending upon what stage in removal proceedings they are in they are either instructed to contact CIS (for final order cases) or we contact OCC on their behalf (for cases that are in proceedings)." Exh. 9, ICE Policy Regarding Encounters with DACA-Eligible Individuals at 365. In other words, following standard DHS policy—which DHS must according to *Regents* and *Casa de Maryland* at this juncture—Ms. Portillo Moreno would be considered for prosecutorial discretion and her case would be referred to USCIS for review.  Although it is not the purview of this Court—nor is it requested by Ms. Portillo Moreno—to weigh in on the vast majority of immigration issues the prerogative of which belongs to the executive, the attached exhibits and governing procedure dictate that, should this TRO staying her removal be entered to ensure

compliance with *Regents*, Ms. Portillo Moreno surely would succeed on the merits of her DACA claim, as well.

### B.  Irreparable Injury to Ms. Portillo Moreno

Ms. Portillo Moreno's removal would injure her severely and irreversibly. *Nken v. Holder*, 556 U.S. 418, 425-26 (2009). Her eligibility for DACA depends on her continued presence in the United States, and removal would break her presence, strip her of that relief, and likely bar her from the county she has called home for the past three decades.

Beyond questions of relief, Ms. Portillo Moreno's delicate health weights in favor of staying her deportation as well. Throughout her late teens and early twenties, she was treated with chemotherapy around her heart. Exh. 2A, at 4, ¶ 15. Since then, she has continued to attend regular checkups about every six months. *Id*. According to the National Cancer Institute, cancer and chemotherapy treatment can compromise a person's immune system, and this immunocompromised status means cancer survivors are uniquely vulnerable to serious medical complications and death if exposed to COVID-19. Exh. 2I(9), National Cancer Institute, "Coronavirus: What People with Cancer Should Know," at 82-85.  Ms. Portillo Moreno's risk of complications and death from COVID-19 may be even higher due to her rapid weight loss of approximately sixty pounds in the last few months. Exh. 2A at 4, ¶ 16.

Her vulnerability would be compounded if she were deported to El Salvador, a country whose response to the virus has been internationally rebuked. Salvadoran President Nayib Bukele has been widely criticized for violating the country's constitution and international human rights provisions in his COVID-19 response. Exh. 2I(8), Human Rights Watch, "El Salvador: Police Abuses in COVID-19 Response: Arbitrary Detention, Hazardous Conditions in Detention, Quarantine," at 86-90. On April 15, 2020, Human Rights Watch reported that hundreds of people had been arbitrarily arrested and detained in hazardous conditions. *Id*. The report further indicates

that the Salvadoran government is forcibly detaining those who return from abroad in containment centers for thirty days. *Id*. These containment centers lack appropriate access to water, food, and medical treatment. *Id*. They are unhygienic and overcrowded, which prevents detainees from practicing social distancing, isolation, and other practices recommended for reducing the risk of COVID-19. *Id*. The country's justice and security minister publicly recognized that individuals at these containment centers "risk contracting the virus in the facility." *Id*. If Ms. Portillo Moreno were deported to El Salvador now, she would presumably be detained for thirty days at one of these containment centers, where there is a high risk of exposure to the virus and documented human rights abuses.

If Ms. Portillo Moreno were to contract COVID-19 in a Salvadoran jail cell, this Court and the undersigned counsel would be powerless to help her. But the Court can avoid that risk altogether by granting the stay on her deportation and enjoining the Defendants from removing Ms. Portillo Moreno.

### C. Injury to Government and the Public Interest

Taking the last two factors together—because they "merge when the Government is the opposing party," *Nken*, 556 U.S. at 435—the minimal injury to the government pales in comparison to the public interest in determining whether an Acting Cabinet Member is acting outside the bounds of the law and, by extension, allowing Ms. Portillo Moreno to pursue her DACA application. It goes without saying that the public interest in its Government's compliance with the Constitution and accompanying statutes is of critical importance.  Contrast that with the continuously wavering dates of removal that Ms. Portillo Moreno's DO communicates to counsel to understand just how committed the Government is to removing Ms. Portillo Moreno. If DHS ultimately determines that DACA should be rescinded and it does so in a lawful manner and in accordance with the Supreme Court's instruction, then so be it.  In the meantime, "the Government

20

should turn square corners in dealing with the people." *St. Regis Paper Co. v. United States*, 368 U. S. 208, 229 (1961) (Black, J., dissenting). Indeed, when an agency changes course, as DHS did here, it must "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars*, *LLC v. Navarro*, No. 15-415 (U.S. June 20, 2016), slip op. at 9 (internal quotation marks omitted).

The government could remedy the first harm, if it proved too much to bear, by releasing Ms. Portillo Moreno, a cancer survivor with no criminal convictions and no risk of flight. Indeed, Ms. Portillo Moreno is eligible for release under ICE's own guidance for DACA-eligible persons. *See* Exh. 5I, ICE Guidance on DACA. The second harm is counterbalanced, if not entirely undercut, by the fact that the government itself has recognized people like Ms. Portillo Moreno as low priorities for enforcement. *See* Napolitano DACA Memorandum (June 15, 2012) ("[A]dditional measures are necessary to ensure that our enforcement resources are not expended on these low priority case . . . Prosecutorial discretion . . . is especially justified here.").

## IV. CONCLUSION

The *Regents* Court expressly declined to decide whether DACA or its rescission are sound policies, addressing only whether the agency complied with the procedural requirement that it provide a reasoned explanation for its action.  Slip op. at 29.  So too, here.  The Court need not address whether DACA is a sound policy; rather, only whether it remains in place based on *Regents* and must be effectuated based on pre-September 2017 agency policy in the light of Mr. Wolf's lack of authority to act as the Secretary of the Department of Homeland Security.  But DHS failed in its first attempt to exercise its authority to rescind the policy because of the lack of constitutional and statutory of its Acting Secretary, and the law of the land remains the same:  DACA-eligible individuals are entitled to the protections it affords.

Dated: July 31, 2020                                Respectfully submitted,

                                                     /s/ Clayton D. LaForge

                                                    Claudia M. O'Brien (DC Bar No. 447354)
                                                    Clayton D. LaForge (DC Bar No. 1033938)
                                                    **LATHAM & WATKINS LLP**
                                                    555 Eleventh Street NW, Suite 1000
                                                    Washington, DC  20004
                                                    Tel:  (202) 637-2200
                                                    clayton.laforge@lw.com
                                                    claudia.obrien@lw.com


                                                    *Attorneys for Plaintiff*